## CURLESS ET AL. *v.* WATSON.

[No. 22,422. Filed June 27, 1913.]

1. APPEAL.—*Right of Appeal.*—*Constitutional Law.*—The right to appeal a cause is not granted by the Constitution, but is a matter of legislative discretion under §4, Art. 7, of the Constitution, which provides that the legislature may regulate and restrict appeals. p. 89.

2. CONSTITUTIONAL LAW.—*Construction of Constitution.*—*Appeal.*—*Writs of Error.*—Our State Constitution is to be understood and construed in the light and by the assistance of the common law, and, in its adoption, the terms "appeals" and "writs of error" were employed as they then existed, as being the right to correct the judgment of an inferior court by appeals in equity cases, and by writs of error in other cases. p. 90.

3. COURTS.—*Jurisdiction.*—The term "jurisdiction," as applied to courts, is the legal right by which judges exercise their authority. p. 91.

4. CONSTITUTIONAL LAW.—*Appeal.*—*Writ of Error.*—At the time of

the adoption of the Constitution, the term "writ of error" had, and it still has, a definite meaning, to wit, that it is a writ authorizing an appeal from an inferior court, assigning error in the proceedings as relating only to matters of law, arising upon the face of the proceedings, so that no evidence is required to substantiate or support it.  p. 91.

5.  CONSTITUTIONAL LAW.—*Appeal.—Writ of Error.—Legislative Power.*—Since by §4, Art. 7 of the Constitution, the legislature is authorized to make such regulations and restrictions with reference to appeals and writs of error, as it may see fit, the rules provided from time to time by statute for the transfer of causes from other courts to the Supreme Court take the place of the constitutional "appeals" and "writs of error."  p. 91.

6.  CONSTITUTIONAL LAW.—*Appeal.—Writ of Error.—Legislative Power.*—The legislature has a right to call the writ of error an "appeal" or "certiorari," and to provide the manner and condition of taking the appeal to the Supreme Court, but when that is done its powers are at an end.  p. 92.

7.  CONSTITUTIONAL LAW.—*Supreme Court.—Appeal.—Writ of Error.*—The provisions of §4, Art. 7 of the Constitution, as to jurisdiction in appeals and writs of error, completely vest that power in the Supreme Court.  pp. 92, 96.

8.  CONSTITUTIONAL LAW.—*Vesting of Powers.—Supreme Court.*—Where a certain power is conferred by the Constitution on the Supreme Court, no other tribunal can be vested with the same power, since where one tribunal is vested with a certain power or jurisdiction, it is to the exclusion of all others.  p. 93.

9.  CONSTITUTIONAL LAW.—*Powers and Duties.—Delegation.—Surrender.*—The duty imposed upon a department of government can neither be delegated nor surrendered, but must be performed by the chosen officers of that department.  p. 94.

10.  CONSTITUTIONAL LAW.—*Legislative Power.—Judicial Power. —Supreme Court.—Appellate Court.—Jurisdiction.—Statutes.*—The legislature can only confer power not already conferred by the Constitution, and since by §4, Art. 7 of the Constitution the power to control appeals and writs of error is vested in the Supreme Court, it cannot confer final jurisdiction in such cases upon any other court, so that that part of the act of 1913 (Acts 1913 p. 454), purporting to repeal §10 of the act of 1901 (Acts 1901 p. 565, §1394 Burns 1908) providing for the transfer of causes from the Appellate Court, is unconstitutional as having the effect to confer a jurisdiction upon that court, which by the Constitution is wholly in the Supreme Court, and since the act would not have been passed without that provision, the entire act must fail.  p. 97.

From Wells Circuit Court; *Charles E. Sturgis*, Judge.

Action by James H. Watson against Ada E. Curless and another. From a judgment for plaintiff, the defendants appealed to the Appellate Court, and, upon the affirmance of the judgment and the overruling of a petition for rehearing by that court, appellants petitioned for a transfer of the cause to the Supreme Court under §1394 subd. 2, Burns 1908, Acts 1901 p. 565. *Petition to Transfer Denied.*

*St. John, Charles & Gemmill* and *Simmons & Dailey,* for appellants.

*Evan B. Stotsenburg, John H. Weathers, William V. Rooker* and *Ulric Z. Wiley,* for appellee.

*John D. Welman, Amicus Curiae.*

ERWIN, J.—An action was brought in the Grant Circuit Court by appellee against appellants to foreclose a street improvement lien, and on change of venue was transferred to the Wells Circuit Court. From a judgment for plaintiff, appellants prosecuted an appeal to the Appellate Court, which affirmed the judgment. *Curless* v. *Watson* (1913), 54 Ind. App. 110, 100 N. E. 576. A petition for rehearing was filed and overruled, and appellants thereupon prepared a petition, in all respects conforming to the provisions of subd. 2, §10 of the act of 1901, providing for the transfer of causes from the Appellate Court. Acts 1901 p. 565, §1394 Burns 1908, subd. 2. Appellants presented this petition for filing, to the clerk of this court within thirty days after the petition for rehearing had been overruled by the Appellate Court.

At the 1913 session of the General Assembly, an act was passed purporting, among other things, to repeal §10 of the act of 1901, *supra.* Acts 1913 p. 454. This act went into effect March 10, 1913. Appellant contends that the act of 1913, in so far as it purports to repeal the transfer act, is unconstitutional and void. This cause presents to this court two principal propositions. (1) Is the act of 1913 (Acts 1913 p. 454) within the power of the legislature to

enact? (2) Is the legislature authorized to create a court with power over appeals from inferior courts, such as is, by the Constitution, lodged in the Supreme Court? Many briefs have been filed in this cause by appellants, appellee and friend of the court, in which the right of appeal, the jurisdiction of the Supreme Court in appeals, the right to appeal from the Appellate Court to this court, and the constitutional authority of the legislature to limit, by regulations and restrictions, the right to appeal, are discussed.

The Constitution of this State declares that "The judicial power of the state shall be vested in a supreme court, in circuit courts, and in such other courts as the general assembly may establish." §1, Art. 7, Constitution of Indiana (As amended March 14, 1881). "The supreme court shall consist of not less than three, nor more than five judges," etc. §2, Art. 7, Constitution of Indiana. "The supreme court shall have jurisdiction, co-extensive with the limits of the state in appeals and writs of error, under such regulations and restrictions as may be prescribed by law. It shall also have such original jurisdiction as the general assembly may confer." §4, Art. 7, Constitution of Indiana.

It is a well-settled principle of law that appeal is 1. a matter of legislative discretion under that provision of §4, *supra,* which provides that the legislature may regulate and restrict appeals, and has been so decided many times, by this court and the courts of other states, having similar provisions in their constitutions. The Constitution of this State does not grant to any one the right to an appeal to this court, or any other court. *Amacher* v. *Johnson* (1910), 174 Ind. 249, 253, 91 N. E. 928, and cases cited; *Sullivan* v. *Haug* (1890), 82 Mich. 548, 46 N. W. 795, 10 L. R. A. 263; *Lake Erie, etc., R. Co.* v. *Watkins* (1902), 157 Ind. 600, 605, 62 N. E. 443, and cases cited; *Randolph* v. *City of Indianapolis* (1909), 172 Ind. 510, 88 N. E. 949; *Barnes* v. *Wagener* (1907), 169 Ind. 511, 82 N. E. 1037;

*Brown* v. *Brown* (1907), 168 Ind. 654, 80 N. E. 535; *Evansville, etc., R. Co.* v. *City of Terre Haute* (1903), 161 Ind. 26, 67 N. E. 686; *Kepler* v. *Rinehart* (1904), 162 Ind. 504, 70 N. E. 806; *Board, etc.* v. *Albright* (1907), 168 Ind. 564, 81 N. E. 578; *Hughes* v. *Parker* (1897), 148 Ind. 692, 48 N. E. 243; *Newman* v. *Gates* (1898), 150 Ind. 59, 49 N. E. 826; *Sims* v. *Hines* (1890), 121 Ind. 534, 23 N. E. 515; *Rupert* v. *Martz* (1888), 116 Ind. 72, 18 N. E. 381; *Branson* v. *Studabaker* (1892), 133 Ind. 147, 33 N. E. 98; *Board, etc.* v. *Davis* (1894), 136 Ind. 503, 36 N. E. 141, 22 L. R. A. 515; *Ex parte Sweeney* (1891), 126 Ind. 583, 27 N. E. 127; *Brown* v. *Porter* (1871), 37 Ind. 206; *State* v. *Vierling* (1870), 33 Ind. 99; *Board, etc.* v. *Lease* (1864), 22 Ind. 261; *Board, etc.* v. *Brown* (1860), 14 Ind. 191, 193; *Hornberger* v. *State* (1854), 5 Ind. 300; *Clarke* v. *Bazadone* (1803), 1 Cranch *212, 2 L. Ed. 85, 95; *Durousseau* v. *United States* (1810), 6 Cranch *307, 3 L. Ed. 232; *Daniels* v. *Rock Island R. Co.* (1865), 3 Wall. 250, 18 L. Ed. 224; *Ex parte McCardle* (1869), 7 Wall. 506, 19 L. Ed. 264.

2. At the time of the adoption of our present Constitution, "*appeals*" and "*writs of error*" were well understood by the Constitutional Convention, when it fixed the jurisdiction of the Supreme Court, as being; the right to correct the judgment of an inferior court by appeals in equity causes, and by writs of error in other cases; and in the adoption of the Constitution, employed the terms, as they then existed. Cooley, Const. Lim. (5th ed.) 47; *Durham* v. *State, ex rel.* (1889), 117 Ind. 477, 19 N. E. 327; *State, ex rel.* v. *Noble* (1889), 118 Ind. 350, 361, 21 N. E. 244, 4 L. R. A. 101, 10 Am. St. 143. "It is also a very reasonable rule that a state constitution shall be understood and construed in the light and by the assistance of the common law, and with the fact in view that its rules are still in force. By this we do not mean that the common law is to control the constitution, or that the latter is to be warped and per-

verted in its meaning in order that no inroads, or as few as possible, may be made in the system of common-law rules, but only that for its definitions we are to draw from that great fountain, and that in judging what it means, we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes.'' Cooley, Const. Lim. (5th ed.) 73. See, also, *Durham* v. *State, ex rel., supra.* Judge Elliott, in *State, ex rel.* v. *Noble, supra,* on page 361, quotes with approval from Webster as follows: ''Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former.''

There can be no misunderstanding as to the term ''jurisdiction'', therefore it is useless to explain what is meant thereby, except to say that it is the legal right by which judges exercise their authority. When the Constitution was adopted, jurisdiction had a definite meaning, and was understood to relate to authority. In §4, Art. 7, of our Constitution the Supreme Court was given jurisdiction over *appeals and writs of error* (our italics). ''Writs of error'' had a definite meaning then, and has yet, viz., ''A writ authorizing an appeal from an inferior court, assigning error in the proceedings as relating only to matters of law, arising upon the face of the proceedings, so that no evidence is required to substantiate or support it.'' The Constitution authorizes the legislature to make such regulations and restrictions as it might see fit, §4, Art. 7, *supra.* This the legislature has done from time to time by providing rules as to the transfer of cases from other courts to the Supreme Court, and this takes the place of the Constitutional ''appeals'' and ''writs of error.'' The question presented to the court in this case is, ''Has the writ of error been abolished in this state?'' This question cannot be important for the rea-

son that our statutory appeal takes its place, and makes full provisions for the transfer of cases to this court, in every case, which the legislature has thought proper to be reviewed on appeal. It makes no difference in what manner a case may be transferred for review so long as the legislature, under its power to regulate and restrict *"appeals"* and *"writs of error,"* has made some provision. The real question is, not how appeals may reach a higher court, but, what court, or what tribunal shall have final jurisdiction in appeals and writs of error? It is well settled that

6. where the power to issue writs, has been fixed by the Constitution, in a certain tribunal, the legislature cannot divest that tribunal of that power. *Harrison* v. *Tradee* (1871), 27 Ark. 59; *Martin* v. *Simpkins* (1894), 20 Colo. 438, 442, 38 Pac. 1092; *People* v. *Richmond* (1891), 16 Colo. 274, 282, 283, 26 Pac. 929. The legislature has a right to call the writ of error "an appeal", or "certiorari," and provide the manner and condition of taking the appeal to the Supreme Court, but when that is done its powers and duties are at an end.

If the legislature has the constitutional authority to vest the Appellate Court with final jurisdiction in appeals, the question of what appeals, or in what cases, the Appellate Court may be given jurisdiction, cannot be questioned by this court. So that the question at issue is not what cases may be appealed to the Appellate Court, but can the legislature vest the Appellate Court with complete and final jurisdiction to review cases, under appeals or writs of error, without being subjected to review by the Supreme Court? If this is answered in the affirmative, then how far it may go, or where it must stop is not a matter for the courts, unless the Constitution fixes the limit. The constitu-

7. tional provision (§4, Art. 7, *supra,*) as to the jurisdiction of the Supreme Court in appeals and writs of error, as completely vests that power in the Supreme Court, as §1, Art. 7, *supra,* vests the judicial power in the

courts. Section 4 is just as clear and definite as §1, and nobody has ever questioned but that the judicial power is vested in the courts, and in no other tribunal. The Constitution vests the judicial power, in every instance, *from all courts*, in appeals and writs of error, in the Supreme Court, excluding none, and fixes its limitations coextensive with the State. §4, Art. 7, *supra.*

It is a well-settled principle of law, that where one tribunal is vested with a certain power, or jurisdiction, it is to the exclusion of all others, and that, if certain power is conferred by the Constitution on the Supreme Court, it follows that no other tribunal can be vested with the same power. *Butler* v. *State* (1884), 97 Ind. 373, and cases cited; *Sterling* v. *Drake* (1876), 29 Ohio St. 457, 23 Am. Rep. 762; *State* v. *Nichols* (1870), 26 Ark. 74, 7 Am. Rep. 660; *Shoultz* v. *McPheeters* (1881), 79 Ind. 373; *Gregory* v. *State, ex rel.* (1884), 94 Ind. 384, 48 Am. Rep. 162; *Little* v. *State* (1883), 90 Ind. 338, 46 Am. Rep. 224; *Pressley* v. *Lamb* (1886), 105 Ind. 171, 4 N. E. 682. In the case of *Butler* v. *State, supra,* the question under discussion was the constitutional power to grant pardons and reprieves. Section 17, Art. 5, of our Constitution, in defining the powers of the Governor, reads as follows: "He shall have the power to grant reprieves, commutations and pardons * * * subject to such regulations as may be provided by law." The court in *Butler* v. *State, supra,* 375, said, "There is no express provision of the Constitution providing for the exercise of these powers by any person charged with official duties under the legislative or judicial department. The conclusion seems to be inevitable that in this State the Governor, under such regulations as may be provided by law, has the exclusive power to grant pardons, reprieves and commutations, and to remit fines or forfeitures. It follows that any legislative enactment which attempts to clothe the courts, or any of the courts, of this State with these powers, or any of them, is void as being in conflict

with the fundamental law. * * * The law is well settled that constitutional restraints are overstepped where one department of the government attempts to exercise powers exclusively delegated to another" and cites *Wright* v. *Defrees* (1856), 8 Ind. 298; *Waldo* v. *Wallace* (1859), 12 Ind. 569; *Trustee, etc.* v. *Ellis* (1871), 38 Ind. 3, 8; *Columbus, etc., R. Co.* v. *Board, etc.* (1879), 65 Ind. 427. It has never been contended by any one, since the above opinion was written, that the legislature could take from the Governor, the jurisdiction to grant pardons, because it is a power which the Constitution has vested in him. The constitutional provision, as to the power of the Governor, in granting pardons, is "under such regulations as may be provided by law," while in the provision as to the Supreme Court, having jurisdiction of appeals and writs of error, it is written "under such regulations and restrictions as may be prescribed by law."

The duty imposed upon a department of government, must be performed by the chosen officers of that department, and it cannot be delegated or surrendered. *State, ex rel.* v. *Noble, supra;* Cooley, Const. Lim. (5th ed.) 138. In speaking of the constitutional powers of the Governor, Judge Cooley uses this language, "The matters which the constitution specifically confides to him, the Legislature cannot directly or indirectly take from his control." Cooley, Const. Lim. (5th ed.) 138. The same author says, "That such powers as are specially conferred by the constitution upon the governor, or upon any other specified officer, the legislature cannot require, or authorize, to be performed by any other officer or authority." Cooley, Const. Lim. (5th ed.) 136.

It has been suggested that the cases of *Clarke* v. *Bazadone, supra; Durousseau* v. *United States, supra; Daniels* v. *Rock Island R. Co., supra; Ex parte McCardle, supra;* and *Sharpe* v. *Robertson* (1849), 5 Gratt. (Va.) 518; and *Forsyth* v. *Hammond* (1897), 166 U. S. 506, 17 Sup.

Ct. 665, 41 L. Ed. 1095, are decisive of the question now before this court. The last case cited was one involving the right to create a circuit court of appeals in the various districts of the United States. There is a marked difference between the Constitution of the United States and our Constitution, in this, the Constitution of the United States in granting appellate jurisdiction to the Supreme Court uses this language, "In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the Supreme Court shall have *original jurisdiction* (our italics). In all other cases before mentioned, the Supreme Court shall have *appellate* jurisdiction, both as to law and fact, with such *exceptions* (our italics) and under such regulations as the Congress shall make." Our Constitution makes no exceptions in granting appellate jurisdiction to the Supreme Court. It reads as follows: "The Supreme Court shall have jurisdiction coextensive with the limits of the state in appeals and writs of error, under such regulations and restrictions as may be prescribed by law." The jurisdiction of the Supreme Court of the United States, over those subjects which the Constitution gives it original jurisdiction, has never been questioned, because that power has been irrevocably fixed in that court, and can be taken away, only, by an amendment to the Constitution.

In the case of *Sharpe* v. *Robertson, supra,* a diff stitution from ours was being considered. The constitution of Virginia, while it vested no particular judicial power in the court of appeals, left the creation of the courts, and the fixing of their power in the legislature. This decision contains a quotation from Justice Marshall in the constitutional convention as follows: "The article leaves the whole subject open to the Legislature. They may limit or abridge the jurisdiction of all the courts as they please." The constitution of Virginia on that subject reads as follows: " 'The judicial power shall be vested in a supreme court of appeals, in such superior courts as the legislature may from time to

time ordain and establish, and the judges thereof, in the county courts and in justices of the peace. * * . * The jurisdiction of these tribunals, and the judges thereof, shall be regulated by law.' * * * 'It was thus made the duty of the legislature to create a supreme court of appeals * * * This duty being performed, the tribunal so constituted stood in the judicial system as the supreme court of appeals, contemplated by the Constitution, with the capacity to receive such appropriate jurisdiction as the legislature thought proper, from time to time, to confer upon it.' " Dissenting opinion *Ex parte France* (1911), 176 Ind. 72, 130, 95 N. E. 515, 536.

In the case of *Daniels* v. *Rock Island R. Co., supra,* the Supreme Court, has stated the rule clearly and concisely as follows: ''To come properly before us, the case must be within the appellate jurisdiction of this court. In order to create such jurisdiction in any case, two things must concur: *the constitution must give the capacity to take it,* and an act of Congress must supply the requisite authority. The *original jurisdiction* of this court, and its *power to receive appellate jurisdiction,* are created and defined by the Constitution; and the legislative department of the government can enlarge neither the one nor the other. *But it is for Congress to determine how far,* within the limits of the capacity of this court to take, appellate jurisdiction shall be given, and when conferred, it can be exercised only to the extent and in the manner prescribed by law. In these respects it is wholly the creature of legislation.'' (Our italics.)

In our State, the Constitution fixes the jurisdiction of appeals and writs of error in the Supreme Court, and in no other tribunal; and provides it shall consist of not 7. less than three, nor more than five judges, and the legislature has no more authority, to confer final power and authority over appeals, in some other tribunal than it would have to increase the membership of this court to ten, a thing nobody concedes. The right to confer juris-

diction, in any particular case, is in the legislature, but the power to receive it is fixed by the Constitution in the Supreme Court, and the legislature has no right to vest any other tribunal with authority to take final jurisdiction in appeals and writs of error; that is "To review errors of law arising upon the face of the proceedings, so that no evidence is required to substantiate or support it," which is a power fixed by the Constitution in the Supreme Court. In *State, ex rel.* v. *Noble, supra,* Elliott, C. J., after quoting numerous authorities concludes as follows: "The Constitution vests the judicial power in every instance, and the Legislature in none. The Legislature has no judicial power, and can confer none upon any person or tribunal. Under the Constitution it may establish courts, but it does not invest the courts with judicial power; the Constitution alone can do that, for all judicial power comes from that instrument and is vested by it in courts and judges."

It is insisted that the case of *Branson* v. *Studabaker* (1892), 133 Ind. 147, 33 N. E. 98, is decisive of this case. In that case the question of the constitutional right to create the Appellate Court and confer appellate jurisdiction upon it, was not discussed, or decided by the court, but as was stated in the case, page 151: "The contention of the appellee's counsel that the act creating the Appellate Court is unconstitutional in so far as it regulates practice in the courts by providing for the transfer of cases from one docket to the other, because such a provision is special legislation upon a subject where general legislation is required by the Constitution, cannot prevail."

10. The question as to whether the legislature may vest the Appellate Court, with final jurisdiction in appeals and writs of error, has never heretofore been presented to this court, and this court has never been called upon to decide it. It may be urged that as §1, Art. 7, declares that "The judicial powers of the state shall be vested

in a supreme court, in circuit courts and other courts as
the general assembly may establish,'' authorizes the legis-
lature to create an Appellate Court, with powers inferior
to the Supreme Court, or even with like powers. But with-
out an amendment taking the power to control appeals and
writs of error away from the Supreme Court, that power
could not be conferred upon any other tribunal. If the
legislature is authorized, by this section of the Constitution,
to create certain other courts, it could not be authorized to
grant to other courts a jurisdiction wholly in the Supreme
Court, fixed so, by a positive declaration of the Constitu-
tion. The legislature can, within its constitutional author-
ity, confer only that power not already conferred by the
Constitution.

In the section of the Constitution referring to circuit
courts, there is this provision, as follows: ''The circuit
court shall consist of one judge, and shall have such civil and
criminal jurisdiction as may be prescribed by law.'' §8, Art.
7, Constitution. In the section relating to justices of the
peace, the Constitution provides, ''They shall continue in
office four years and their powers and duties shall be pre-
scribed by law.'' In these last two sections mentioned, it
was intended that the legislature should fix the jurisdiction
of circuit courts and justices of the peace; and if the same
provision had been intended, by the framers of the Con-
stitution, as to the jurisdiction of the Supreme Court, they
would have so expressed it. It is contended that the power
to regulate and restrict the Supreme Court, in appeals, gives
the legislature the right to take away the final jurisdiction
of appeals, and bestow it upon whomsoever it may see fit.
''Restriction'' as defined by Webster, is the act of restrict-
ing, confining or limiting; the state of being restricted, lim-
ited or confined within bounds. ''Regulation'' is defined,
by the same authority, as the act of regulating; the act of
reducing to order or of disposing in accordance with rule
or established custom; a rule, order or direction from a su-

perior or competent authority; a governing or prescribing a course of action. And while the legislature may withhold from this court jurisdiction in certain cases, it cannot confer final jurisdiction upon any other tribunal "To hear and determine the questions of law arising upon the face of the record without any evidence to substantiate it," and make its actions final. While the legislature may regulate and restrict the Supreme Court, as to how it may take jurisdiction, it cannot take away from the court the jurisdiction over this particular subject, granted by the Constitution, and bestow it upon any other tribunal, and a legislative enactment, which seeks to do so is contrary to the Constitution. The legislature has the undoubted right to regulate appeals, but the power to regulate does not give authority to take away, or bestow it upon another tribunal.

The only ground upon which the creation of the Appellate Court can be constitutionally justified is, that jurisdiction may be conferred upon it to determine such cases as the legislature may designate, subject to the constitutional power vested in the Supreme Court to review its action, either upon writs of error or certiorari, as an inherent power under the Constitution, which even the legislature cannot take away. The provision for transfer in effect takes the place of the common-law writ of error; not a writ of right, as is the writ of error, but a right is given by the provision for transfer, which under the power to regulate appeals, the legislature may make.

It was evidently the intention of the legislature, that the transfer clause of the act of 1901 should perform the office of the writ of certiorari and writ of error, and with the provision as to transfer, the act of 1901 is not obnoxious to the Constitution, and is a saving clause, but for which, it cannot be justified, and the repeal of it by an unconstitutional act did not affect it, unless it be to restore writs of error, or appeals, or both, the jurisdiction of which is solely in the Supreme Court, and strike down the act creating the

Appellate Court entirely; and we should give it a construction which will uphold it as far as we can, which the provision for transfer does, without rendering it obnoxious to the Constitution. As the act of 1913 expressly repeals the transfer provision it is therefore void in that particular, and as it would not have been passed without that provision the entire act must fail.

There being no error in the judgment of the Appellate Court in this cause, the petition to transfer is denied.

Morris and Cox, JJ., dissent.

## CONCURRING OPINION.

SPENCER, C. J.—I wish to state my reasons for concurring in the conclusion reached in the prevailing opinion. The substance of appellants' contention here is that by abolishing the right of transfer, the act of 1913 (Acts 1913 p. 454) makes of the Appellate Court a tribunal of final appellate jurisdiction equal in rank with the Supreme Court; that it is, therefore, unconstitutional and void.

The first question which naturally presents itself is, May the General Assembly create a court of appellate jurisdiction which shall be coordinate with and equal in rank to the Supreme Court? As preliminary to a consideration of this proposition it is necessary to determine whether the legislature may create any court with appellate jurisdiction. The provisions of the Constitution which govern the creation of courts and enable them to exercise judicial power are found in §§1, 4 and 8 of Article 7, in that instrument. They are as follows: "1. The judicial power of the state shall be vested in a supreme court, in circuit courts, and in such other courts as the general assembly may establish." "4. The supreme court shall have jurisdiction co-extensive with the limits of the state in appeals and writs of error, under such regulations and restrictions as may be prescribed by law. It shall also have such original jurisdiction as the general assembly may confer." "8. The circuit courts

shall each consist of one judge, and shall have such civil and criminal jurisdiction as may be prescribed by law." These sections, when construed together, make it evident that the legislature is empowered to create such other courts both of appellate and original jurisdiction, as it may deem expedient. This is apparent from a reading of §1, but it must be borne in mind that while the legislature may create a court, that tribunal can receive its judicial authority only from the Constitution. Therefore, while §1 authorizes the General Assembly to establish courts other than those expressly mentioned therein, such courts may exercise judicial functions only in accordance with §§4 and 8. Under these provisions our legislature has, from time to time, created superior, criminal, probate and juvenile courts with original jurisdiction, and has transferred thereto a part of the jurisdiction theretofore exercised by the circuit courts. The creation of these courts has been upheld by the Supreme Court, since the circuit court was given only such jurisdiction "as may be prescribed by law", that is, by the governing will. The legislature, as a potent representative of that will, was thereby authorized to add to and take from the civil and criminal jurisdiction of the circuit courts as might seem expedient. So, too, the legislature is authorized to establish other courts with appellate jurisdiction but such tribunals may receive only such power as will vest in them under §4, *supra*. That section does not grant to the Supreme Court such jurisdiction "in appeals and writs of error as may be prescribed by law", but invests that tribunal with *entire* jurisdiction "co-extensive with the limits of the state in appeals and writs of error, under such regulations and restrictions as may be prescribed by law." The meaning of this last phrase should be apparent. The appeal, as a remedy of review, was unknown to the common law but is entirely of statutory origin. Its gift is wholly within the discretion of the legislature and that body may grant or withhold it as it may desire. In other words, the

right to an appeal may be "regulated" or "restricted" as the governing will, expressed through the legislature, may prescribe, but when once granted, the extent to which it may be carried presents another question. The very term "appeal" suggests a reaching out to a higher power and, as applied to our judicial procedure, it means a petition to a superior court for relief from the supposed error of an inferior tribunal. Obviously, there must be some one court of appellate jurisdiction from which no further appeal may be had—a court of last resort. Under our jurisprudence great reliance is placed upon the collected and published decisions of our Appellate Court as judicial declarations, valuable indeed, as legal expressions but binding only on the parties to the record, and, although intermediate courts of appeal may be created, there must be some method, other than moral suasion, whereby the decisions of the latter shall be kept in harmony with the decisions of the supreme tribunal. Honest mistakes will be made and there must always remain one court of review with authority to check the action of other appellate tribunals and to prevent confusion in their decisions. For an instructive case emphasizing the necessity for such power of review, see *Forsyth* v. *Hammond* (1897), 166 U. S. 506, 512, 17 Sup. Ct. 665, 41 L. Ed. 1095. By our State Constitution that power is vested in the Supreme Court and no enactment of the General Assembly can take it away. In brief, the writer would thus state the rule: Where the right to an appeal from the judgment of an inferior tribunal to a court of appellate jurisdiction is not expressly secured by the Constitution, the legislature may, in its discretion, make the decision of the inferior court final. *Randolph* v. *City of Indianapolis* (1909), 172 Ind. 510, 88 N. E. 949; *State* v. *Rockwood* (1902), 159 Ind. 94, 64 N. E. 592; *Sims* v. *Hines* (1890), 121 Ind. 534, 23 N. E. 515; *Rupert* v. *Martz* (1888), 116 Ind. 72, 18 N. E. 381. But when the right to an appeal is once granted, its exercise may not be limited, under our

Constitution, to an appeal to some inferior appellate tribunal. Jurisdiction over appeal is, by §4, *supra,* vested in the Supreme Court, which means that such appeals must be determined by that tribunal or by some other appellate court whose decision is subject to be reviewed by the Supreme Court. The act by which our Appellate Court was established expressly provided that said court should "be governed in all things by the law as declared by the Supreme Court of this State and it shall not directly nor by implication reverse or modify any decision of the Supreme Court of this State." Acts 1891 p. 39, §25, as amended in Acts 1893 p. 29, §1429 Burns 1908. It was thus recognized that such court was to be only an intermediate appellate tribunal, directly subject to the Supreme Court, and that is the only ground on which it can be constitutionally justified. In this connection it may be suggested that this court has recognized the power of the legislature to limit the right of appeal in certain cases with an appeal to the circuit court. In such cases however, the cause is tried *de novo,* both as to issues of fact and issues of law, under the circuit court's original jurisdiction. Appellate jurisdiction proper means the right to review supposed errors of inferior tribunals as apparent upon the records of such tribunals and, as thus defined, is not possessed by the circuit court. *Miller* v. *Wabash R. Co.* (1908), 171 Ind. 109, 111, 85 N. E. 967. From the above it is apparent that the legislature has the authority to create an intermediate court of appellate jurisdiction and may determine in what classes of cases appeals shall be taken directly to such court, but that the legislature cannot take from the Supreme Court its constitutional power to review the action of such inferior appellate tribunal. The remaining question is, Does the act of 1913 attempt to take away that power?

The Constitution provides that the Supreme Court shall have jurisdiction in appeals, "under such regulations and restrictions as may be prescribed by law." The term

"law", as there used, means the expressions of the govern-
ing will and such expressions are not limited to legislative
enactments.    The general principles and remedies of the
English common law and the statutes of the British Parlia-
ment made in aid thereof prior to the year 1607, prevail in
Indiana in so far as they are not inconsistent with the Con-
stitution of the United States or of this State, and are not
inconsistent with the Federal and State statutes. §236 Burns
1908, §236 R. S. 1881; *Grimes' Exrs.* v. *Harmon* (1871), 35
Ind. 198, 9 Am. Rep. 690; *Dawson* v. *Coffman* (1867), 28
Ind. 220.

The principal processes known to that system of juris-
prudence by which to have reviewed in a court of appel-
late jurisdiction the judgment of an inferior tribunal, were
the writ of error and the writ of certiorari.    Whether the
former is still in force in this State need not be considered.
It is enough to say that in practice, at least, it has been,
wholly or partly, superseded by the statutory appeal.    But
the writ of certiorari has never been interfered with by
any legislative enactment.    It may be said the "transfer
act", which the act of 1913 seeks to repeal, was in aid
thereof and is not inconsistent with any provision of our
constitutional or statutory law.    While the office of the com-
mon-law writ of certiorari is, generally, to confine inferior
tribunals within their jurisdiction and to prevent them from
exercising powers not delegated to them, yet it "may be
resorted to where, having jurisdiction of a proceeding,
those tribunals make an order or judgment which exceeds
their powers." *Stokes* v. *Knarr* (1860), 11 Wis. 407, 411.
So, in the case before us, while the legislature had author-
ity to and did create an appellate court, vested with author-
ity to determine appeals in accordance with the law of the
land, yet there still remained to the Supreme Court the
power vested in it by the Constitution to review the action
of the Appellate Court if it should appear that that court
had erred.    The "transfer act" gave litigants of this

State no new right but aided and made more simple in part the service of the writ of certiorari. In fact, neither the writ of certiorari, except where made so by statute, nor the order of transfer, as known to our practice, is a matter of right available to every litigant. Their issuance is a matter of judicial discretion, to be granted as justice seems to require. That the writ of certiorari is available in this State is evident. In *Newman* v. *Gates* (1898), 150 Ind. 59, 49 N. E. 826, this court, in effect, recognized that the writ obtained in our practice but declined to issue it in that case for two reasons: (1) that the decision of the Appellate Court did not contravene a ruling precedent of the Supreme Court, and (2) that the court was of the opinion that the decisions of the Appellate Court were final. It may be seriously doubted whether the court was called upon to determine the latter proposition, but in any event, in the opinion of the writer the decision should be disapproved in so far as it suggests that the Appellate Court has or can have final appellate jurisdiction.

While it is apparent that the court calendars are congested and that as a matter of expediency it might be well to find a way to relieve the existing condition, yet such must be a constitutional way. The oath of a judge of this court requires that he support the Constitution of this State, and expediency can never stand in the way of supporting the Constitution. The writer hereof does not believe that all the dire calamities are to be visited upon the people and property of this State as a result of this court deciding that our Constitution means what it says, that "a supreme court" means one and does not mean two. To hold that the legislature can, by virtue of the language "regulations and restrictions as may be prescribed by law", as in the Constitution used, confer final jurisdiction of appeals and writs of error upon some appellate tribunal other than the Supreme Court, thereby making the jurisdiction of such court coordinate with the Supreme Court, means that the legisla-

ture may create as many Supreme Courts of this State as it should desire. Such a proposition needs but the statement thereof to show its absurdity. There can no more be two supreme courts created by legislative enactment, under whatever name they may be given, than there can be two governors of this State.

MYERS, J.—I concur in the main opinion of Erwin, J. Much attention has been given by counsel and the court to the questions presented, but upon the reasoning and authority set forth in *Ex parte France* (1911), 176 Ind. 72, 92, 95 N. E. 515, and *I. F. Force Handle Co.* v. *Hisey* (1913), 179 Ind. 171, 100 N. E. 450, that the repeal of §10 (Acts 1901 p. 565, §1394 Burns 1908) renders the act in so far unconstitutional, and as it would not have been passed except with the idea that §10, *supra,* was valid, the entire act must fail, and as the attempted repeal of a constitutional act, by an unconstitutional act does not affect the former, the act of 1901 is still in force.

The fact that there is no express provision in the act of 1913 making the decisions of the Appellate Court final in the class of cases committed to it, is immaterial, in view of the fact that its decisions would in effect be and were intended by the act to be final, and thereby render them equal with the decisions of, and the court co-ordinate with the Supreme Court, unless there is a power of review.

## DISSENTING OPINION.

MORRIS, J.—I cannot concur in the result reached by the majority opinion; with some of its declarations of law I agree, but against others I most earnestly protest.

The petitioner, in asserting the invalidity of the act, relies chiefly on the majority opinion, in *Ex parte France* (1911), 176 Ind. 72, 95 N. E. 515, which held that the act of 1911 violated §4, Art. 7, of our Constitution, because it denied jurisdiction to this court of appeals from money judgments

for over $6,000; and that it violated §1, Art 7, because, as held, it invested the Appellate Court with a rank coordinate with, or superior to, that of this court. The particular reason is not given, in such majority opinion, for the last conclusion reached, but, as I interpret it, it was because the act was deemed to give the Appellate Court the power to determine the boundaries of its own jurisdiction. *Pittsburgh, etc., R. Co.* v. *Peck* (1909), 172 Ind. 562, 88 N. E. 939. While I do not think the act of 1911 was justly chargeable with the construction that it gave the Appellate Court that power, such question is eliminated from consideration here, because §2 of the act of 1913 (Acts 1913 p. 454) expressly fixes, in this court, the power to determine such question. This case however does present the same question that arose in *Ex parte France, supra,* relating to the legislative power, under §4, Art. 7, to withhold, from this court, appeals from money judgments for over $6,000; for in that respect, the acts of 1911 and 1913, are exactly alike. On that question, the prevailing opinion here repudiates the majority opinion in *Ex parte France, supra,* and adopts the rule contended for in the dissenting opinion of Morris, J., in that case, as shown by the following: "It is a well-settled principle of law that appeal is a matter of *legislative discretion* under that provision of §4, *supra,* which provides that the legislature may regulate and restrict appeals, and has been so decided many times, by this court and the courts of other states, having similar provisions in their constitutions. The Constitution of this State does not grant to any one the right to an *appeal to this court,* or any other court." *Ante* 89. (Italics mine throughout this opinion.)

In support of the above declaration, many cases are cited, among which is *Ex parte Sweeney* (1891), 126 Ind. 583, 27 N. E. 127, which ordered transferred from the docket of this court to that of the then newly-created Appellate Court, for *exclusive final determination,* a great mass of undetermined causes theretofore regularly appealed to this court; and,

among the number, was *Taggart* v. *Tevanny* (1891), 1 Ind. App. 339, 27 N. E. 511, involving a judgment against a decedent's administrator for $19,250.

Inasmuch as the points presented in petitioners' brief are rejected in the majority opinion here, it would, in ordinary cases, be improper for this court to consider the constitutionality of the 1913 act, for it is a settled rule that courts will not, unless absolutely necessary, declare void the act of a coordinate branch of the government.

It is true that Mr. Abram Simmons, one of petitioners' attorneys, did, in his oral argument (afterward printed), suggest reasons for holding the act void, and these seem to have been adopted in the majority opinion here; but Rule 22 of this court, expressly provides that no point, not contained in the statement thereof in appellants' brief, "shall be raised afterwards, * * * in oral or printed argument."

However, where the face of the record presents a question of this court's jurisdiction of the subject-matter, the above rule was not intended to apply. At the threshold of every such cause, this court is met by a question that must be determined regardless of briefs or arguments, and it must be determined in the absence of either, just as necessarily as if presented most elaborately. A court's jurisdiction of the subject-matter cannot be conferred by agreement, nor waived by inaction. This court must know the boundaries of its own jurisdiction, and will not subject itself to the reproach implied by the suggestion that it must, or may, wait upon the advice of counsel, before determining, in any particular cause, its jurisdiction, or lack thereof, over the subject-matter disclosed. *Branson* v. *Studabaker* (1892), 133 Ind. 147, 33 N. E. 98; Ewbank's Manual §289. I am therefore of the opinion, that, if the act in question is void for the reason that the Constitution invests this court with the exclusive power to finally decide petitioners' (appellants') cause, it is the right and duty of this court to so declare, although such reason has not been presented in petitioners' brief.

I also agree with the declaration in the prevailing opinion that "The power to confer jurisdiction, in any particular case, is in the legislature." When it is conceded that the power to *confer* jurisdiction in any case, is a legislative one, and that the power to *exclude* appeals to this court is also legislative, and further, that the constitution does not grant to any one the *right of appeal to the Supreme Court,* surely the validity of this act is conceded, for the Constitution, since the amendment of 1881, will be searched in vain for any provision prohibiting the legislature from vesting in some court, other than this, jurisdiction in any particular class of appealable cases. The power to enact laws, generally, is vested in the General Assembly. It is not necessary to search for specific constitutional authority to enact a given law. On the other hand, one asserting the unconstitutionality of an act must point out the specific constitutional inhibition against it. "The legislative department is not made a special agency, for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion." Cooley, Const. Lim. (7th ed.) 126. It is consequently of no importance whatever, that no specific authority is found in the Constitution to confer jurisdiction in appeals, in the classes of cases here in controversy; the general vesting of legislative power gives the authority, unless specifically prohibited; and the amendment of 1881 removed all pretense of such inhibition.

I further concur in the majority opinion in its declaration to the effect that the functions of the writ of error, as known to the framers of our Constitution, are merged in, and performed by, our statutory appeal. It is said in the majority opinion here: "And while the legislature may *withhold from this court,* jurisdiction in certain cases, it cannot *confer* final jurisdiction upon any other tribunal * * * and make its actions final." Against any such doctrine I most earnestly protest. It wholly ignores the purpose and effect of the amendment of 1881, of §1, Art. 7, of our Con-

stitution. It further ignores the power, given the legislature, *before the amendment of 1881,* to confer final appellate jurisdiction, in appeals from statutory *nisi prius* courts, on courts other than the Supreme; and, viewed in the light of our State's history, subverts the intent and purposes of the people in adopting and amending the provisions of our Constitution, relating to courts. Section 1, Art. 7, as originally adopted in 1851, read as follows: "The judicial power of the state shall be vested in a Supreme Court, in circuit courts, and in such *inferior* courts as the General Assembly may establish." By the amendment of 1881, the word *"other"* was substituted for "inferior".

Section 8, Art. 7, provides that circuit courts "shall have such civil and criminal jurisdiction as may be prescribed by law." Appellate jurisdiction, in circuit, or statutory, courts, was neither *conferred nor withheld* in express terms, but, as the statutory courts permitted, were, by §1, made *inferior* to circuit courts, by necessary implication no statutory court could review the decisions of the superior circuit courts. Aside from this limitation, final appellate jurisdiction was conferred by legislation, on *circuit courts,* to the exclusion of the Supreme Court, in appeals from *statutory courts,* both under the Constitution of 1851, and that of 1816. The court provisions of the Constitution of 1851 were copied, substantially, from those of the Constitution of 1816. R. S. 1843 p. 53.

Under the Constitution of 1816, the legislature created a probate court, with broader jurisdiction than is usually conferred on such courts, and which included actions at law, or suits in equity, in all actions against heirs, devisees, executors and administrators, and their sureties, and, actions for partition. Such courts were invested with equity powers. An appeal from their judgments was allowable to *either the circuit or Supreme Court, at appellant's option.* R. S. 1843 p. 668.

In *Brownlee* v. *Whitesides* (1846), 8 Blackf. 80, a probate

court rendered judgment for defendant. The plaintiff appealed to the circuit court which reversed the judgment, and remanded the cause to the probate court. From the judgment of the latter court, the defendant appealed to this court. In dismissing the appeal, for lack of jurisdiction, this court, by Dewey, J., said: "These provisions (R. S. 1843 p. 668) confer upon the circuit courts *concurrent appellate jurisdiction with the Supreme Court* over the judgments, decrees, orders, and proceedings of the probate courts; and have, as we conceive, the effect of rendering the decision of either court *conclusive* as to all matters adjudicated by it. The judgment now attempted to be reversed was rendered by the probate court in conformity to the *decision of the circuit court sitting as a court of errors.* It cannot be again revised either in that court, or this. We have no jurisdiction over the cause." This case was followed in *Gore* v. *Gore* (1850), 2 Ind. *55; *Indiana Mut. Fire Ins. Co.* v. *Routledge* (1855), 7 Ind. 25, and other cases. The decisions of this court on the subject were uniform and consistent.

The Constitution of 1816 conferred no appellate jurisdiction on the circuit court. It, like the present one, conferred on the Supreme Court, unlimited capacity to receive appeals, and yet it was, as held, within the legislative discretion to confer on the circuit court, concurrent, coordinate, appellate jurisdiction with the Supreme Court, in appeals from statutory courts and such jurisdiction was *final.* And such legislation was deemed as no invasion of the supremacy of this court. Two of the above cited cases were decided shortly before the meeting of the Constitutional Convention, which formulated our present Constitution. It is a familiar rule, that where a constitutional provision has been construed and acted on by the legislature, and the legislative construction has been adopted· by the Supreme Court, the people, in readopting such provision adopt also such construction, unless a contrary intention appears.

In 1852 the probate court had been abolished, and the common pleas court succeeded to its jurisdiction. Section 13 of the common pleas court act of 1852, provided that an appeal should lie from such court, in all cases, "to the circuit or Supreme Court, at the option of the party applying therefor". 2 R. S. 1852 p. 18. This act was construed in *Duncan* v. *Duncan* (1854), 6 Ind. 28, which followed the former decisions of *Brownlee* v. *Whitesides, supra,* and *Gore* v. *Gore, supra.* See, also, *Swift* v. *Lane* (1857), 9 Ind. 182. It thus appears that under the new Constitution, before the amendment of 1881, as well as the old, it was competent to give the circuit court equal power with this court, in appeals from judgments of statutory courts.

Long before the amendment of 1881, intermediate appellate jurisdiction from a statutory court, was given the general term of the superior court. Acts 1871 p. 48, §§1343-1355 R. S. 1881, §§1464-1476 Burns 1908.

As early as 1865, it became impossible for the circuit court of Marion County to dispose of the business brought before it. The legislature created a criminal court, with jurisdiction, in criminal cases, original and appellate, the same as conferred on circuit courts. Acts 1865 (s. s.) p. 150. In 1871, the superior court of Marion County was created, with jurisdiction in civil cases substantially concurrent with that of the circuit court. Succeeding legislatures created criminal and superior courts—modeled after those of Marion County—in great numbers, to meet the demands of increased business. The session of 1877, which proposed the constitutional amendment adopted in 1881, created superior courts in Cass, Vanderburgh, and Wayne counties, and provided for another judge of the Marion superior court. All acts creating such courts were held constitutional. *Combs* v. *State* (1866), 26 Ind. 98; *Clem* v. *State* (1870), 33 Ind. 418; *Guetig* v. *State* (1879), 66 Ind. 94, 32 Am. Rep. 99; *Smith* v. *Smith* (1881), 77 Ind. 80.

In *Combs* v. *State, supra,* this court curtly disposed of

the technical constitutional objections urged against the act of 1865, in the following language: "Large communities require more time for the transaction of judicial business than small ones, and if one court cannot do the business there must be more created. And it is idle to say that the legislature cannot provide for such an exigency."

Each of these statutory courts was given less jurisdiction than the circuit courts, because, by §1, Art. 7, before the amendment of 1881, such courts were "inferior" to the circuit courts; and it was deemed that *extent* of jurisdiction was then a test of superiority. *Smith* v. *Smith, supra; Board, etc.* v. *Albright* (1907), 168 Ind. 564, 572, 81 N. E. 578.

While the object of the 1881 amendment was to relieve this court of the burden of an ever increasing number of appeals (circuit courts were already relieved by superior and criminal courts) the radical change in the constitutional provision, wiping out the limitation of *inferiority,* in courts of statutory creation, incidentally affected the status of circuit courts, so that now statutory courts may be created, with the identical jurisdiction of circuit courts. *Board, etc.* v. *Albright, supra.* In that case, in an opinion evincing great learning, it was said. "When the constitution \* \* \* required that such courts as might be created should be 'inferior' to the circuit courts, their relative rank was properly *tested by the extent of their jurisdictions,* but, with the word 'other' substituted, it appears to us that no possible constitutional objection could exist to the creation of a court which shared with the circuit court its jurisdiction and its power. \* \* \* No question of making said courts inferior to the highest *nisi prius* courts is here involved. When an attempt is made, by the narrowing of their jurisdiction, to put them in the category of inferior courts, it will be time enough to vindicate their right. The hope of constitutional government for the future does not require that the legis-

lative power should in all cases be bound down with iron bands.'' The act in question there, conferred on the newly-created superior court of Elkhart and St. Joseph counties, the same *quantum* of jurisdiction as the law confers on circuit courts. Acts 1907 p. 7, §1574 Burns 1908.

Constitutions must be considered as a whole. In amending one section, other sections not amended, may be indirectly affected, and they must be considered in their new relation, rather than in the old. The cardinal object of construing a constitutional provision is to ''give effect to the intent of the people in adopting it.'' Cooley, Const. Lim. (7th ed.) 89. ''Narrow and technical reasoning is misplaced, when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government.'' Cooley, Const. Lim. (7th ed.) 93. ''A reasonable construction is what such an instrument demands, and should receive; and the real question is, what the people meant, and not how meaningless their words can be made by the application of arbitrary rules.'' Cooley, Const. Lim. (7th ed.) 95.

Section 4, Art. 7, must be considered in relation to §1 of the same article, as the latter reads since the amendment. It is not a universal rule that the same word is used with the same sense wherever it occurs in a constitution. *Board, etc.* v. *Albright supra,* on page 570. Mr. Justice Story says: ''It does not follow, either logically or grammatically, that because a word is found in one connection in the Constitution, with a definite sense, therefore the same sense is to be adopted in every other connection in which it occurs. This would be to suppose that the framers weighed only the force of single words, as philologists or critics, and not whole clauses and objects, as statesmen and practical reasoners; and yet, nothing has been more common than to subject the Constitution to this narrow and mischievous criticism. Men of ingenuity and subtle minds, who seek for symmetry and

harmony in language, having found in the Constitution a word used in some sense which falls in with their favorite theory of interpreting it, have made that the standard by which to measure its use in every other part of the instrument.'' 1 Story, Constitution §454.

Story further says that even in literal interpretation the rule observed is to follow that sense of the words which is agreeable to common use, without attending to etymological fancies, or grammatical refinements, and that the causes that led to the enactment are often the best exponents of the words used. 1 Story, Constitution §400.

Our Constitutions and laws were made the better to secure to all the people the right to life, liberty and the fruits of their industry. Courts were created to better administer justice, ''speedily and without delay'', and to make effective the intent of the people disclosed in their organic and statutory law. The law is a practical thing, designed for practical people, engaged in the State's manifold industries. Our Constitution was not made by philologists or lexicographers, and its plain provisions should not be repealed by resort to ''etymological fancies or grammatical refinements.'' When this court knows, as it does here, what the people intended by the 1881 amendment, such intent, after the lapse of thirty-two years, should not be thwarted by some technical dictionary definition. *Moore-Mansfield, etc., Co.* v. *Indianapolis, etc., R. Co.* (1913), 179 Ind. 356, 101 N. E. 296.

In the year 1877, when the population and wealth of the State were much less than now, it became evident that it was a physical impossibility for this court to determine all the causes appealed to it. While it had repeatedly been held that final jurisdiction, in appeals from other than circuit courts, might be conferred on a court other than the Supreme, it was not then competent to give any court, other than this, final jurisdiction of appeals from *circuit courts*. In 1877, appeals from circuit courts constituted the great

volume of business on the docket of this court. Since then, superior courts have been created in such numbers that appeals from them are almost as numerous as those from circuit courts.

In 1877, the crowded condition of the docket of this court, afforded a condition of actual peril, and §12 of our Bill of Rights (§12, Art. 1, Constitution), which guarantees a speedy administration of justice was fast becoming an unredeemed pledge. To remedy such condition, and relieve this court of a part of its appellate burden, the legislature proposed the amendment to §1, Art. 7, by substituting "other" for "inferior" and thereby unshackling the legislature of the limitation on its power to create a court to finally determine appealable cases. There can be no doubt about the purpose of the legislature in proposing, or of the people in adopting, this amendment.

In *State, ex rel.* v. *Noble* (1889), 118 Ind. 350, 364, 21 N. E. 244, 4 L. R. A. 101, 10 Am. St. 143, it was said, "We *know judicially* that our Constitution was so amended as to invest the legislature with power to create courts superior to the circuit courts, and that this was done for the *purpose of enabling litigants to have appeals disposed of by a constitutional tribunal.*" This opinion was written by Elliott, J., who had been one of the judges of the superior court of Marion County, previous to 1881, and who was a judge of this court when the amendment was adopted.

*State, ex rel.* v. *Mount* (1898), 151 Ind. 679, 51 N. E. 417, 52 N. E. 407, was decided after the creation of the Appellate Court. The opinion was by Howard, J., author of the Appellate Court act of 1891. This opinion quotes with approval, relative to the purpose of the 1881 amendment, the above declaration from *State, ex rel.* v. *Noble, supra.* In the course of the opinion it was further held, on page 682: "Under authority of section 1, Art. 7, of the Constitution, which provides that, 'the judicial power of the State shall be vested in a supreme court, in circuit courts, and in

such other courts as the General Assembly may establish,' the legislature, by an act approved February 28th, 1891, created the Appellate Court.''

Neither the purpose, nor the scope, of the amendment of 1881 is discussed in the prevailing opinion, yet, what this court judicially knew in 1889 and 1898, it still knows judicially, and surely the people, with such known purpose in view, in adopting the amendment, have the right to have such purpose given effect by the courts in construing an act passed in furtherance of such intent. Courts have no rightful power to disregard or ignore a constitutional provision; yet, in my judgment, the prevailing opinion can only stand, even as to circuit court appeals, by ignoring, or disregarding the effect of the 1881 amendment; as to appeals from statutory courts, legislative power held prior to the amendment must be disregarded, if the majority opinion shall stand.

The logical effect of the prevailing opinion is to deny the constitutional existence of the Appellate Court. It would be absurd to hold that it was ever created as an intermediate court of appeals. Not a vestige of intermediate jurisdiction was given it for the first ten years of its existence. On the contrary, it is repeatedly declared in the act of its creation that its jurisdiction is ''final'' and ''exclusive''. Acts 1891 p. 39, §§1, 10, 12, 13, 19. There is no room for construction here. There was no intention to create anything but a court of last resort, for cases appealable to that court.

By the amendment of 1901 (Acts 1901 p. 565) the Appellate Court was given intermediate jurisdiction in appeals from money judgments of over $6000, but this provision was repealed in 1907 (Acts 1907 p. 237). The amendment of 1901, as amended in 1907, makes the Appellate Court's action final, except in cases (a negligible number) where the opinion of that court contains an erroneous declaration of law. It would be absurd to charge the legislature of 1901

with the intent to create a court whose only constitutional (intermediate) jurisdiction would be in cases where the court erroneously declared the law in its opinions, for it must not be forgotten that by the act, as amended in 1901, the action of the Appellate Court is final and exclusive, in the absence of an erroneous declaration in the opinion, and only where such error exists has this court any power to review its action.

The transfer provision of the 1901 amendment was not intended to perform any function of an appeal or writ of error, as then known to our Constitution, or statutory laws, or to the common law.  As said by Jordan, J., in *Ex parte France, supra,* the purpose was not in the interest of the losing litigant, ''but was to give the Supreme Court a *revising hand* over the *opinions* of the Appellate Court.''  In reality, it is but a censorship of Appellate Court opinions —a thing unknown to any system of jurisprudence previous to the act of Congress of 1891. *Forsyth* v. *Hammond* (1897), 166 U. S. 506, 17 Sup. Ct. 665, 41 L. Ed. 1095.

That the transfer provision of 1901 was not intended to perform any office of the common law writ of *certiorari* is manifest when we consider that such office, or function, was an entire stranger to the common law.   In reality, the common law writ of *certiorari* was used principally to keep inferior courts within the boundaries of their jurisdiction, and it never performed any of the regular functions of a writ of error or appeal.  4 Ency. Pl. and Pr. 91; *People* v. *Judge, etc.* (1840), 24 Wend. (N. Y.) 249; *Milwaukee Iron Co.* v. *Schubel* (1872), 29 Wis. 444, 9 Am. Rep. 591.

This court under the transfer act, has no power to review the record in a case appealed to the Appellate Court, unless that court has written an opinion, and unless the opinion contains some erroneous declaration of law.   In an application to transfer, the question is not whether the *decision* of the Appellate Court is right or wrong, but whether the *opinion* contains an *erroneous declaration.   United States*

*Cement Co.* v. *Cooper* (1909), 172 Ind. 599, 88 N. E. 69.
If the decision of the Appellate Court is right, the case must
be transferred if there is an erroneous legal statement in the
opinion. *Klein* v. *Nugent Gravel Co.* (1904), 162 Ind. 509,
70 N. E. 801. On the other hand, if the decision of the Ap-
pellate Court is clearly wrong, if no opinion is written, or, if
written, it contain no erroneous declaration of law, this
court has no power of review. *Barnett* v. *Bryce Furnace
Co.* (1901), 157 Ind. 572, 62 N. E. 6.

The Appellate Court is required to write opinions only in
cases where judgments are reversed, and, of course, where
there is no opinion, there can be no transfer, yet, where
there is an opinion, if error does not appear on the face
thereof, there is nothing to censor, and, the application to
transfer must be denied, although the record might disclose
a judgment affirmed, which was rendered on a complaint
that failed to state a cause of action, and which was unsup-
ported by any evidence.

The narrow scope of the transfer provision proved un-
satisfactory to the bar of the State. See proceedings, State
Bar Association, 1910, 190-207. The practical operation of
the transfer act of 1901, during its twelve years of existence,
shows that it has only given this court the power to review
less than five per cent of the cases appealed to the Appellate
Court. In the other ninety-five per cent, the decisions of
the Appellate Court were as much a finality as the decisions
of this court. Yet, during the first ten years of the existence
of the transfer act, a thousand or more undisposed of cases
had accumulated on the dockets of the two courts, and the
Appellate Court was (March, 1911) about two and one-half
years behind in its work. It is no wonder the bar com-
plained of a provision which absorbed so much time of this
court as to practically nullify the constitutional guaranty
of a speedy administration of justice, with no result except
the transfer of probably about fifteen cases per year—a
number not greatly exceeding that of the former decisions

of this court overruled in the same space of time. To remedy such confessed evil, the legislature of 1911, passed the act held invalid in *Ex parte France, supra,* for reasons that are repudiated in the prevailing opinion here. The legislature of 1913 had the same purpose in view—getting rid of the law's delay—but this purpose is thwarted by reasons not supported by any authority, and, in my judgment, even less cogent than those assigned for the ruling in *Ex parte France, supra.*

Within one month after the amendment of 1881 was adopted, the legislature passed an act designed to relieve the docket of this court of its great accumulation of undisposed of cases. A Supreme Court Commission was created, consisting of five judges, to be appointed by this court. Acts 1881 p. 92. Its life was orginally limited to two years, but in 1883 it was continued for a like period. In 1885 the work designed for the commission was practically completed, and its life was not extended. The validity of the Supreme Court Commission act was never questioned in this court. While this commission was not a court, the commissioners examined the records and wrote the opinions, subject to this court's approval, and accomplished all the practical purposes of a separate court of appeals.

In 1889, the utter impossibility of one court reviewing all the records in appeals was again demonstrated in the accumulation of undisposed of cases. The legislature passed a peculiar act, by which it attempted to "appoint deputy judges", to relieve this court. The act was declared invalid in *State, ex rel.* v. *Noble, supra.* The succeeding legislature created the Appellate Court.

It is said in the majority opinion that the question of the power of the legislature to invest the Appellate Court with final jurisdiction of appeals and writs of error has never been presented to this court for decision. This is erroneous, but, assuming its correctness, it by no means follows that this court would be justified in striking down the Appel-

late Court act. After a practical construction of an act, such as this, has been acquiesced in for more than twenty-two years by all departments of our government, including this court, and by the entire bar and people of the State; when the results of overturning such construction would work such injustice, hardship and confusion, as even a constitutional amendment could not remedy, it would be the duty of this court to refrain from its overthrow. *Moore-Mansfield, etc., Co.* v. *Indianapolis, etc., R. Co., supra.* In *Fall* v. *Hazelrigg* (1874), 45 Ind. 576, 585, 15 Am. Rep. 278, it is said: "It is a well settled rule of construction, that a contemporary exposition of a constitution or a statute practiced and acquiesced in for a period of years, fixes the construction, and the courts will not shake or control it."

In *Stewart* v. *Laird* (1803), 1 Cranch *299, 2 L. Ed. 115, it was contended that judges of the Supreme Court of the United States had no right to sit as circuit judges. It was said: "It is sufficient to observe, that practice, and acquiescence under it, for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is set at rest, and ought not now to be disturbed."

In *Rogers* v. *Goodwin* (1807), 2 Mass. 475, it was said on this subject: "Although, if it were now *res integra*, it might be very difficult to maintain such a construction, yet at this day the argument *ab inconvenienti* applies with great weight. We cannot shake a principle which in practice has so long, and so extensively, prevailed. If the practice originated in error, yet the error is now so common that it must have the force of law. The legal ground, on which this provision is now supported, is that long and continued usage furnishes a contemporaneous construction, which must prevail over the mere technical import of the words." Evi-

dently what is meant in the majority opinion, in declaring that the question has not been presented before to this court for decision, is, that the precise question was not presented by the briefs of parties litigant. If so, the same is true here, and the majority opinion here, on such theory, must be held mere *dictum,* for no question decided here is presented by petitioners' brief. The question was presented by the briefs in *Newman* v. *Gates* (1898), 150 Ind. 59, 49 N. E. 826, and decided by this court. The question of the validity of the Appellate Court act has been *actually and properly* decided, scores and hundreds of times by this court.

It would be a reproach to this court to assert, that when it, by the decision in *Ex parte Sweeney* (1891), 126 Ind. 583, 27 N. E. 127, transferred to the Appellate Court for final exclusive determination, a great mass of undisposed of cases, it did not decide the constitutionality of the Appellate Court act of 1891. Surely it will not be contended that this court will permit a stranger to take from it the records in appeals, of which it has lawful jurisdiction, and thus deprive it of its sole constitutional authority to finally determine such appeals, and afterwards justify its dereliction by the absurd plea that no lawyer appeared to advise it of its constitutional authority. In *Ex parte Sweeney, supra,* it was said: "The petition * * * requires an examination of the act * * * creating an Appellate Court. * * * It carves out of the general appellate jurisdiction of the State *a part and transfers it to the court it creates.* It takes from a great field designated parts. * * * It is only necessary to ascertain and decide what classes of cases are declared to be within the jurisdiction of the newly-created court. * * * The clerk will make the transfer of cases to the Appellate Court, as required by section 19 of the act, under the rules laid down in this opinion."

In *Branson* v. *Studabaker* (1892), 133 Ind. 147, 149, 33 N. E. 98, this court, on its own motion, ordered briefs filed

by the parties on the question of jurisdiction. In appellee's brief it was contended that jurisdiction was in this court because the Appellate Court act was unconstitutional, and the appellant contended that jurisdiction was here because title to real estate was involved. This court decided the Appellate Court act constitutional, but held that this court had jurisdiction. In the course of the opinion it was said: ''A question of jurisdiction is in the record and must be determined. * * * A court must look to the law for its jurisdiction of the subject, and must, notwithstanding the agreement of the parties, decline to entertain jurisdiction if it is not conferred by the law. We must, therefore, ascertain and determine whether this appeal is within the jurisdiction of this tribunal, or *within that of the Appellate Court.*'' In passing on the validity of the Appellate Court act it was said on page 152: ''The provisions of the statute *creating the Appellate Court, and authorizing the transfer to that court of cases appealed to this court prior to its enactment* are valid. * * * The Appellate Court is a legal tribunal in which all appeals *over which it is given jurisdiction may be heard and determined.*''

In *Newman* v. *Gates* (1898), 150 Ind. 59, 49 N. E. 826, a petition was filed in this court, for a writ of *certiorari,* to the Appellate Court, to require a certification of the record to this court, for the purpose of determining whether the Appellate Court had exceeded its jurisdiction. On behalf of respondent, it was contended by counsel, as set forth in their ''points and authorities'', that ''the Appellate Court was created and given exclusive jurisdiction in certain cases by the act of 1891'' and, as to such cases, it is a court of ''last resort'', and its decision final. In its opinion denying the writ the court held: ''The act creating that court provides expressly for a court of final resort although with certain defined and limited jurisdiction. In all cases in which the Appellate Court is given jurisdiction its decisions are made final and not subject to review, whether by appeal

or by writ of *certiorari*. The evident purpose of the legis-
lature was *not* to provide for an *intermediate court, but for
one of last resort."* The opinion was by Howard, J., who
was one of the members of the General Assembly that passed
the Appellate Court act of 1891.

*James* v. *Lake Erie, etc., R. Co.* (1897), 148 Ind. 615,
48 N. E. 222, was a case first appealed to the Appellate
Court and reversed; the complaint was then amended so
as to confer jurisdiction on this court, on the second appeal.
It was contended on the latter appeal, that this court was
not bound by the law of the case as declared in the opinion
of the Appellate Court, on the first appeal. In the opinion
by Hackney, J., it is said, on page 617: "The lower court,
in this cause, followed the law of the case as declared by the
Appellate Court, *a court of last resort,* whose opinion in this
case requires the respect and obedience, both of the trial
court *and of this court."* This case was followed in *Ohio
Valley Trust Co.* v. *Wernke* (1913), *ante* 49, 99 N. E. 734,
and, the holding in the latter case would have been errone-
ous, if the Appellate Court were not one of "last resort."

In *Baker* v. *Groves* (1891), 126 Ind. 593, 26 N. E. 1076, in
an opinion by Miller, J., this court said: "The question of
jurisdiction meets us at the threshold. * * * We have
concluded that this, and other similar cases, are within *the
exclusive jurisdiction of the Appellate Court.* * * * The
clerk of this court is, therefore, ordered and directed to
transfer this cause to the Appellate Court *for final deter-
mination."*

In *Parker* v. *Indianapolis Nat. Bank* (1891), 126 Ind.
595, 26 N. E. 881, this court by Coffey, J., said: "The first
question confronting us, * * * relates to the jurisdiction
of this court. * * *. Section one of an act of the General
Assembly of 1891, creating an Appellate Court, provides
that said court shall 'have exclusive jurisdiction of all ap-
peals * * * in * * * all cases for the recovery of money

only.' * * * We are of the opinion that we have no jurisdiction in this cause, and it should be certified to the Appellate Court. It is so ordered.'' Like action was taken in *City of Hammond* v. *New York, etc., R. Co.* (1891), 126 Ind. 597, 27 N. E. 130.

In *Williams* v. *State, ex rel.* (1891), 130 Ind. 58, 29 N. E. 1078, it was held in an opinion by Olds, J., on an appeal to this court, in a bastardy action: ''The Appellate Court having *exclusive* jurisdiction in this class of cases, this case is transferred to the Appellate Court for decision.''

In *Harris* v. *Howe* (1891), 129 Ind. 72, 27 N. E. 561, this court held, in ordering the case transferred: ''We are of the opinion that the cause is within the exclusive jurisdiction of the Appellate Court.'' The same holding was made in *Courtney* v. *Courtney* (1891), 129 Ind. 272, 29 N. E. 1056.

In *Williams* v. *Citizens Enterprise Co.* (1899), 153 Ind. 496, 55 N. E. 425, it was held by Baker, J.: ''This action is for the recovery of a money judgment only, and the amount in controversy does not exceed $3,500. The Appellate Court, therefore, has *exclusive jurisdiction* of this appeal.'' In each of the above cases, this court decided that the Appellate Court was one of last resort, and that its jurisdiction was exclusive; and in each case, the constitutional question was presented for determination no less than it is here. The Federal courts have followed the opinions of our Appellate Court, as one of last resort. In *Troy Wagon Works Co.* v. *Hancock* (1906), 152 Fed. 605, 81 C. C. A. 595, the United States Circuit Court of Appeals, Seventh District, it was held in an opinion by Grosscup, J., that that court was bound by the opinion of our Appellate Court, in *West* v. *Fulling* (1905), 36 Ind. App. 617, 76 N. E. 325, though evidently deemed erroneous. The court said: ''Under the statute creating the Indiana Appellate Court (Sec. 10, Indiana Acts 1901 p. 567), it is provided that

the jurisdiction of the Appellate Court shall be final, except in the event that the case is transferred to the Supreme Court.''

It must be borne in mind that when created, and for ten years thereafter, no jurisdiction was conferred on the Appellate Court except that which was final and exclusive. Hundreds of cases—in fact a large per cent of appealable ones—have erroneously been brought to this court, when, under the Appellate Court act, they belonged in the other. This court, generally on its own motion, has transferred such cases to the proper court without delivering any opinion. The constitutional existence of the Appellant Court ·was by necessary implication, involved in the act of transferring each case, for this court, and this court only, had the constitutional right to finally review the causes, if the Appellate Court was without such right.

There is no better evidence of one's good character than the fact that it was never questioned. Is it not also true that where a court has been in existence twenty-two years, and has determined finally about 8,000 cases, and its constitutional existence has only been twice questioned by litigants (*Branson* v. *Studabaker, supra,* and *Newman* v. *Gates, supra*) and, when questioned, determined in favor of the validity of the act of its creation, that all doubts should be deemed as set at rest? During the first ten years of its existence, when the Appellate Court was one of exclusive final jurisdiction, practically all of the leading lawyers of the State practiced before it, including such distinguished ones as Joseph E. McDonald, John M. Butler, John T. Dye and hundreds of others of almost equal eminence. Practically every judge of this court for the last twenty years, including all the present members thereof, practiced regularly before the Appellate Court from 1891 to 1901. Of course all lawyers, with extended practice, lost one or more cases appealed to the Appellate Court during that period, yet none of them (except in the two cases mentioned) ap-

pear to have doubted the validity of the Appellate Court act. Any lawyer who entertained any doubt about the validity of the Appellate Court act, from 1891 to 1901, would, when his client's cause was decided against him by the Appellate Court, have been guilty of gross dereliction of duty, by failing to offer his services in testing the validity of the act. That there was no test, (except the two cases mentioned) is conclusive proof that the lawyers of Indiana never doubted the validity of the act; and surely the opinions of the thousands of eminent lawyers who have represented clients in the Appellate Court, are worthy of some consideration. We have here, therefore, several cases where this court, in written opinions has affirmed the validity of the Appellate Court act of 1891; we know that in hundreds of other cases this court, by necessary implication, reached the same conclusion; we have a practical construction of the act, by the lawyers and litigants of the State; and after a lapse of twenty-two years, we awaken to the discovery that all the judges, lawyers and people of the State have all this time been mistaken about the meaning of the Constitution; that the Appellate Court had no constitutional existence previous to 1901; and, if the reasoning in the prevailing opinion shall be carried to its logical conclusion, it has had no constitutional existence since.

It is difficult to conceive of the consequence of the ruling. From 1891 to 1901 the Appellate Court determined about 4,000 cases. If the act of its creation was invalid, its judgments were, and are, absolutely void. *Norton* v. *Shelby Co.,* 118 U. S. 425, 6 Sup. Ct. 1121, 30 L. Ed. 178; *In re Norton,* 64 Kan. 842, 68 Pac. 639, 91 Am. St. 255; *State, ex rel.* v. *Mount* (1898), 151 Ind. 679, 51 N. E. 417, 52 N. E. 407; *State, ex rel.* v. *Friedley* (1893), 135 Ind. 119, 34 N. E. 872, 21 L. R. A. 634. There may be such a thing as a *de facto* officer of a valid office, but there is no such thing as a *de facto* court. As said in *State, ex rel.* v. *Mount, supra,* "In order that there be a judge, there must be a

court.'' Nor is that all. The law grants appeals from practically all judgments of *nisi prius* courts. The appeal requires a review of the record on its merits. If the Appellate Court cannot determine these cases finally, the Supreme Court must, and it must hand down an opinion in each case decided. §5, Art. 7, Constitution of Indiana. All appealable cases must, under the prevailing opinion, be reviewed on their merits by this court, for if the Appellate Court is not one of last resort, litigants have a right to a review of the record, and an opinion thereon, by this court. It can never be held that this court may rightly deny a petition to transfer, except on the theory that the Appellate Court is one of last resort. Indeed the language of the act of 1901 would admit of no such construction, but were it otherwise, a theory that the legislature may limit the right of review by the mere existence of error in the *opinion* of an intermediate court, would directly conflict with other provisions of our Constitution. Clause 3, §22, Art. 4, and §23, Art. 1, Constitution of Indiana. Classification is justifiable only when based on some reason inherent in the subject-matter of the legislation. To attempt to give to a class of litigants the right of review by this court, of judgments where the Appellate Court made an erroneous declaration of law, and deny it to another class (ninety-five per cent) where there may be no such declaration, would be entirely without reason. It is sufficient to say that the act of 1901 makes no such attempt. It excludes a review by this court, of approximately ninety-five per cent of the cases appealed to the Appellate Court, because, as believed by the General Assembly, and as repeatedly held by this court, the General Assembly lawfully constituted the Appellate Court as one of last resort; if not, the act of 1901 is also invalid.

There are now pending before the two courts probably 1000 appeals. About 600 new causes arrive annually. It is evident that this court cannot get time to hear merely the oral arguments in all appealable cases. With the Ap-

pellate Court sitting in two divisions, (the equivalent of two courts) the eleven judges of the two courts have failed to dispose of the accumulating business since 1901. Every one knows that at no time in the last forty years has one court been able to dispose of all appealable cases, and we know that thirty-two years ago, because of that fact, the people of Indiana amended their Constitution, so that the legislature might be left free to grant the necessary relief. Yet, under this reasoning, if carried into effect, the administration of justice, in the appellate department, will be practically paralyzed.

If the act of 1913 be considered as a matter of first impression, *with nothing* but the wording of the Constitution as a guide, it must be held valid, because there is no constitutional limitation on the power of the General Assembly to pass the act. If it be considered in the light of judicial decisions of this court the same result is reached, as shown by the repeated declarations of this court heretofore cited, relative to the original act creating the Appellate Court; for it must not be forgotten that the act of 1913 varies in no substantial particular from that of the original act of 1891, as amended in 1893. If it be considered in the light of the decisions of the Supreme Court, of the United States, commencing with *Clarke* v. *Bazadone* (1803), 1 Cranch *212, 2 L. Ed. 85, which decided that, under the constitution of the United States (after which ours was modeled), it was for the legislative department of the government to determine what courts shall be given jurisdiction to finally determine appealable cases, and ever since adhered to by that court, for 110 years, the act must be held valid.

If it be considered in the light of decisions of courts of other states, with similar constitutional provisions (which most of them have) the same result is reached. Most of these states have been confronted with the same problem that Indiana has met—the physical impossibility of dispos-

ing of all appealable cases by one court—and they have solved the problem by creating tribunals similar to our Appellate Court, and such legislative action has always been upheld as constitutional. *People* v. *Richmond* (1891), 16 Colo. 274, 26 Pac. 929, and cases cited; *Sharpe* v. *Robertson* (1849), 5 Gratt. (Va.) 518.

It is presumed that legislatures in enacting laws, and the people in adopting constitutions, do not contemplate absurdity as a consequence of their actions, and therefore in construing constitutions or statutes, a construction involving absurd consequences should be avoided. Is not the consequence absurd here, when we know that the very object of creating a judicial department of the government was to secure a speedy administration of approximate justice; that more than thirty-two years ago the people discovered that one court was no longer able to dispose of appeals, and removed the constitutional impediment by the most important amendment made to our Constitution since 1851; that the purpose of the amendment was to permit just such a court as was created in 1891; that the validity of the creation of such court has stood a practical construction of twenty-two years, and a judicial one for the same length of time?

In my judgment the act of 1913 is a valid enactment and should not be overthrown by any mere technical definitions of words found in the Constitution, when it is perfectly apparent what was intended by the people in adopting and amending it.

Cox, J., concurs in this opinion.

NOTE.—Reported in 102 N. E. 497, 502, 504. See, also, under (1) 2 Cyc. 507, 517; (2) 8 Cyc. 740; (3) 11 Cyc. 659; (4) 2 Cyc. 508; (5) 2 Cyc. 509; (6) 2 Cyc. 507, 509, 517; (7) 11 Cyc. 706, 816; (8) 11 Cyc. 706; (9) 8 Cyc. 830, 857; (10) 11 Cyc. 706, 710.